Gary Sherrer (SBN 113047) **LAW OFFICE OF GARY SHERRER**
875-A Island Drive, Suite 403
Alameda, California 94502
Telephone: (510) 421-2838 | Facsimile: (510) 217-3930
Email: gsherrerlaw@gmail.com

Attorney for Plaintiff Charles R. Williams, M.D.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CHARLES R. WILLIAMS, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>SANTA ROSA MEMORIAL HOSPITAL, aka Providence Santa Rosa Memorial Hospital ("SRMH"); et al.,<br><br>Defendants. | Case No. 3:25-cv-06118-SI<br><br>**AMENDEDDECLARATION OF CHARLES R. WILLIAMS, M.D. IN SUPPORT OF OPPOSITION TO DEFENDANT ANESTHESIA AND ANALGESIA MEDICAL GROUP, INC.'S MOTION TO DISMISS**<br><br>Date: November 20, 2026<br>Time: 10:00 a.m.<br>Ctrm: 1, 17th Floor<br>Judge: Hon. Susan Illston |

I, Charles R. Williams, M.D., declare:

**Qualifications and Personal Knowledge**

1. I am Plaintiff, a California physician licensed since 1983 and board certified in anesthesiology and pain medicine. My relevant experience includes prior practice in emergency medicine and in cardiac anesthesia. I have practiced approximately 44 years without adverse action by the eight state medical boards that licensed me. **Exhibit** 1, Dr Williams CV, State Licensure
2. This declaration is based upon on my observations, personal communications, identified records, experience and medical training. Where I express an opinion or inference, I identify its basis.

**Assignment, Evaluations, and Patient Care**

3. I began providing anesthesia at the Santa Rosa Memorial Hospital ("SRMH") on , July 18, 2023, through the Maxim staffing Agency. My agreement, dated June 30, 2023, states my compensation and assignment terms. AAMGI held SRMH's exclusive anesthesia contract and contracted with Maxim Staffing Agency. **Exhibits 2, Conformation of Assignment and Exhibits 3 Maxim Contract**
4. On the July 20 , 2023, I was fired , without notice or hearing, after the death of patient AF who expired following a contraindicated surgery. I was summarily suspended on July 28, 2023 for "conducting my own investigation" into the matter. The Peer review process has been and is being done with conflicted decision makers. The conflicted decision makers include, but are not limited to , one with a financial interest in the outcome and one whose son has a financial and professional interest in the outcome. I received notice of charge for revocation of privileges on November 14, 2023. Exculpatory information was and continues to be withheld and there has not been full disclosure in response to multiple discovery requests. The Fair Hearing has been delayed indefinitely without written confirmation of consent to stay the proceedings.
5. In compliance with credentialing policy I performed seven proctored cases, on July 19 and 20 of 2023, and all evaluations were rated "acceptable" for skill and competence. Nevertheless, they appeared, in the initial Notice of Charges issued on, November 14, 2023, and the two amended versions of the Notice of Charges despite MEC Defendants' admission that none of the medical records of those patients had been reviewed. **Exhibits 4, Proctored Cases and Exhibits 5**, **Notice of Charges, Exhibit 6 , Letter May 27, 2023**
6. On July 20, 2023, I provided anesthesia to Patient AF, who died in the operating room 40 minutes after an absolutely contraindicated laparoscopic appendectomy. The North Gauge Expert Report, obtained by the MEC and dated August 14, 2023, confirmed that the expert had no knowledge of the AF patient's severe cardiac disease status and further confirmed that the expert did not receive the patient's complete medical record. More than Twelve months later, on August 26, 2024, the expert revised his report and intentionally made factually misleading statements. Contrary to his original report which stated a quantitative monitor should have been used as the standard of care, he revised his report to misleadingly state that the train of four monitor, a known qualitative monitor , was the quantitative monitor that he referenced in his initial report, over one year earlier. He had not been provided with the complete medical record. **Exhibit 7, North Gauge Report 2023/2024, Exbibit 46 Up-to Date Article**

7. The clinical events below preceded my immediate termination, the subsequent disciplinary proceedings, the charges , and. expert report**.** **Exhibit** 8 **Summary Suspension**
8. The electronic Medical Records of AF, available on July 20, 2023, confirmed the patient was in the emergency room a total of 9 hours ; that he was a 68 year old obese male, hypertensive,

diabetic, had heart failure from multivalvular heart disease, and had documented falling vital signs. The emergency room ( ER ) medical records within 30 minutes of admission to the ER documented evidence of sepsis ( infection in the blood) , low albumin, pancreatitis , and low potassium level. Within three hours after arrival to the ER, a CT scan of the abdomen confirmed a perforated appendix and evidence of peritonitis. This combination of studies confirmed a life-threatening surgical emergency. In my opinion most students in American medical schools are taught to recognize this life-threatening condition and to provide critical presurgical treatment by their second or third year of medical school. The medical record confirms this patient never received any critical care medical services in the ER. **Exhibit 9, ER Vital Signs, Exhibit 10, CT Scan ABDOMEN, Exhibit 11, ER Vital Sings**

9. In spite of the need for stabilization and critical care services, Dr Thomas , the emergency room physician documented that "no critical care services were delivered." **Exhibit 12 Dr. Thomas Note, (Altered)**

10. The emergency room medical record further confirms that no critical care service was delivered in spite of the patient's deteriorating condition. In my professional opinion the failure to provide critical care services and continued decompensation contributed to this patient's death 12 hours later..." **Exhibit 12 Dr. Thomas Note, (Altered), Exhibit 11 ER Vital Signs (falling)**

**11.** In spite of the patient's medical record documenting hemodynamic instability and need of critical care services none were provided. Following the patients death, Dr. Thomas altered his medical record entries by adding the statement that the patient was "stable to the OR." This alteration of the medical record falsely indicates there was no need for critical care services, including hemodynamic stabilization (falling vital signs). **Exhibit 13 Thomas Note (Unaltered) Exhibit 12, Dr. Thomas Note, (Altered)**

12. The record documented that it was not until around the sixth hour of presentation to the emergency room that Dr. Thomas even called a surgeon. Though the surgeon, Dr Courtney White, was called he never came the ER to evaluate the patient but gave phone orders to obtain a consent for a contraindicated Laparoscopic Appendectomy and also ordered contraindicated medications for this patient with a perforated bowel (perforated Appendix). The contraindicated medications consisted of orders for oral laxatives which might cause further leakage of fecal material out of the perforated bowel into the abdominal cavity. The record provided to date does not document whether the patient received that ordered laxative treatment nor is there evidence that Dr. Courtney White ever interviewed or examined the patient, ever wrote a note in the chart or cosigned his verbal orders. **Exhibit 14, ER Vital Signs/ MAR**

13. Dr Mathew Singer, Dr Cortney White's associate, was the second surgeon participating in this patient's care. Dr Singer however did not see the patient until around the eighth hour following presentation to the emergency room. This surgeon documented in his admission note the falling vital signs, which confirmed hemodynamic instability. **Exhibit 15, Dr. Singers Admitting Note**

14. The documented Hemodynamic instability was an absolute contraindication for a laparoscopic surgery. However, Dr Singer chose to perform the higher paying laparoscopic appendectomy

rather than the indicated, shorter and less invasive, open appendectomy which was the standard of care. **Exhibit 16, Singers Opertive Note, Exhibit 17 , Contraindications to Laparoscopic Surgery**

15. Additionally, this patient had other relative contraindications to Laparoscopic Surgery including Peritonitis (infection of the peritoneal cavity). **Exhibit 18 Contraindications to Laparoscopic Surgery**

**Operating Room**

16. Dr Singer's operative reports confirm, as did the physical exam , that the patient suffered with peritonitis. Dr Singer's Operative Report documents, and I saw, both pus with fecal contamination across the intestines within the abdominal cavity. **Exhibit 19, Anesthesia Note, Exhibit 20**
17. The first documented antibiotic was not given until approximately five hours after arrival to the ER. **Exhibit 14 MAR/ ER VS**
18. Dr. Thomas, the Emergency Physician, states in his admitting note, of July 20th , that no critical-care service was delivered and ,in a later version of the ER medical record, adds the phrase that the patient was "stable to OR." That description conflicts with the recorded vital sign deterioration and misleadingly supports the patient's inappropriate hospital admission to an unmonitored hospital bed. Complete audit records have been requested and are needed to establish who and when each alteration of the medical was made. Such information has not yet been disclosed. This may have been a violation of 42 UC 1395dd, and an EMTALA violation. **Exhibit 12, Thomas Note, (Altered), Exhibit 21, 42 USC 1395dd**
19. Dr. Courtney White, the Trauma Surgeon and admitting physician gave telephone orders including an order to obtain a consent for laparoscopic appendectomy and an order for laxative medications. The records do not document informed consent as there is no record of his interview and evaluation of the patient ,or required counter signature of his orders nor a signed consent for the treatment with contraindicated medications. **Exhibit 14, MAR**
20. **Dr. Singer,** Trauma Surgeon and Intensivist, saw the patient on the morning of July 20, 2023 documented the unstable vital signs. Dr singer never obtained informed consent for a Laparoscopic Appendectomy nor did he ever document the patient's severe heart disease including the diagnosis of Mitral Stenosis , 100% Occlusion of the Right Coronary artery, or Akinetic/ Dyskinetic heart muscle contraction. These conditions were documented in September 2020 and was immediately available through the electronic medical record ( EMR ). Like his colleagues, Dr.'s Thomas, Kaplan, White and Vasiliauskas, the diagnoses of Mitral Stensosi, 100% blockage of the Right Coronary Artery and akinetic/Dyskinetic heart muscle contractions were not mentioned in their notes or addressed in their care plan or interpretation of diagnostic

studies. The Medical record clearly documents an echocardiogram performed by Dr Vasiliauskas in October 2022, which was flawed and describes poor acoustic windows (could not see into the heart) but Dr Vasiliauskas, characterized the mitral valve as normal without cautionary mention of the flawed study. These findings required reconciliation. **Exhibits Exhibit 15, Dr Singers Admitting Note, Exhibit 22, Transthoracic Echo 2022, Exhibit 23, Transthoracic Echo 2020**

21. The Urologist, Dr Kaplan had performed several urinary diversion procedures for chronic kidney stones in prior months, had previously ordered a cardiac clearance for surgery but like his associates failed to mention this patient's severe heart disease with both Aortic and Mitral Stenosis. **Exhibit 21 , Kaplan Opertive Note**

22. In the operating room, Dr. Singer refused to perform an open appendectomy and proceeded with a laparoscopic procedure after being informed of the patient's multi valvular heart disease, Aortic and Mitral Stenosis, the latter of which he never cited in his admitting note or addressed in his care plan. Without this documentation it is unlikely that the AF patient received complete disclosure of risks or gave informed consent for the surgical procedure performed. **Exhibit 25 Anesthesia Addendum Notes, Exhibit 15 Dr Singers note, Exhibit 2020 Transthoracic Echo**

23. **Before the** surgery, I questioned Dr Singer about the surgical procedure, in this patient with Aortic Stenosis, which is known to predispose to Sudden Death. Dr. Singer responded, "Don't worry, it's not for you." **Exhibit 25, Anesthesia Addendum Notes, Exhibit 26**

24. Dr Singer likewise did not perform a customary peritoneal washout despite observations of fecal contamination and pus documented within the abdominal cavity. **Exhibit 16, Singers Opertive Note.**

**25.** Resuscitation was required throughout the Anesthetic and at its midpoint the Realtime vital signs showed signs of acute heart failure with decompensation (pulse pressure variation). To avoid a cardiopulmonary arrest the Train of Four (four visible twitches with stimulation or TOF) monitor was checked. That monitor confirmed an adequate status. The reversal agent was quickly given and the return of spontaneous ventilation and stabilization of the blood pressure followed thereafter. The heart function, under the pressure of the laparoscopic surgery and anesthetics, was insufficient to tolerate positive pressure ventilation (use of the ventilator). This exculpatory information refutes that outside expert's statement that procedures followed prior to extubation were insufficient to ensure adequate respiratory function. The expert's report stated "the case involved an uneventful anesthesia until extubation(**Exhibit 27 Realtime Vital Sings PPV**

26.With wound closure, the anesthetic was lightened, the patient awoke, had to be restrained, and self-extubated. The endotracheal tube was dislodged, from the trachea and correspondingly the respiratory rate fell from 22 to 15 breaths per minute. I removed the dislodged tube from the patient's mouth. Over the next 20 minutes the patient remained conscious, was breathing spontaneously and responsive to verbal stimuli. Only upon loss of consciousness , one of the standard indications for ACLS resuscitation, were the resuscitation efforts initiated. This exculpatory information is documented in Dr Ogunkoyas' chart entry and refutes the expert report stating "there was a delay in the intubation and resuscitation...patient expired as a result of the

[this] deviation from the standard of care..." **Exhibit 28, Realtime Vital Signs, 08/02/23, Exhibit 29 Realtime Vital Signs CMB, Exhibit 30, Dr Ogunkoya Note, Exhibit 19, Anesthesia Note , Exhibit 31, Dr Lowreys Note**

**Code**

**27.**At the beginning of resuscitation, I observed Dr. Ogunkoya perform an esophageal intubation that was recognized and corrected in less than a minute. Both myself and Dr Lowery simultaneously observed gastric-fluid in the endotracheal tube which was removed and replaced. Two physicians immediately recognized esophageal intubation and it was corrected. Dr Ogunkoya, Dr Lowry and Dr. Williams chart entries refute the expert report stating "there was a delay in the intubation and resuscitation...patient expired as a result of the [this] deviation from the standard of care..." **Exhibit 22 Anesthesia Adendum Notes Exhibit 19, Anesthesia Note, Exhibit 31, Dr Lowery Airway Note Exhibit 30 Dr Ogunkoya Note**

28. The patent never recovered consciousness, or a viable oxygen saturation or viable blood pressure following the esophageal intubation and death was pronounced by Dr Singer at 14:42. Death was pronounced 20 minutes following the start of resuscitation efforts and 40 minutes following the end of surgery.
**Exhibit 35, Code Record**

**29.** The North Guage expert commentary, in all versions, state "... I can not comment on a cardiac etiology for the patients demise..." as he was not given the full medical record including all medical record entries, the transthoracic echo from 2020 and heart scan showing akinesis/dyskinesis of the left ventricle, 100 % occlusion of the right coronary artery and the mitral stenosis with valve area on 1,8 cm2 (normal arear 4-6 cm2) . **Exhibit 2020 Transthoracic Echo and Clinical Notes**

30.The **medical** record documents that Nurse Michelle Vaughn, R.N., participated in the AF patient's care before and after the surgery. However, on the Report of Death Form, in which communications with the Sheriff's Coroners Office are documented, evidence of record alteration exists where the Autopsy box was checked then "scratch out." There was no legal attestation of who or when the alteration was made. Additionally, days later authorization from the Sheriff was sought, again under false pretenses, to transfer the decedent out of the jurisdiction of Sonoma County to Tracey Memorial Chapel in San Joaquin County for cremation. **Exhibit 32 Report of**

**Death Form, Exhibit 33 Permit for Disposition of Human Remains, Exhibit 31 Code Record - MV**

31.The Coroners Intake Record documents that Michelle Vaughn R.N., falsely stated that the AF patient died after prescheduled surgery rather than emergency appendectomy, that no malpractice occurred and that Dr. Singer intended to execute the legal task of completing the death certificate. **Exhibit 34 Coroners Intake Form, Exhibit 27 Code Record- MV**

32.Plaintiffs note to the coroner, citing the cause of death, was removed from the medical record. According to BPC 802.5 it may have required an autopsy and subsequent referral to the State of California Medical Board. The copy of the medical record given to the State of California Medical Board as a required part of the 805-report was incomplete and did not contain Plaintiffs Note to the coroner, preoperative note in which Plaintiff documented informed consent including the risk of Death. Likewise, Medical Board of California was never given the pqatient's Death Certificate, which falsely documents a place of and cause of death. The SRMH 805 report was signed by Chief of Staff Dr. Muller and hospital CEO Chuck Kassis. This act may have been violation of several state laws. **Exhibit 36, Anesthesia Note to Coroner, Exhibit 37 BPC 805.2, Exhibit 38, California Government Code 27491**

33.Likewise, The Death Certificate, signed under oath by Dr Cooper and submitted to the Sonoma County Health Department, in section 102 falsely documents the patient died in the ER as an OP (outpatient) and that no surgery had been performed. **Exhibit 39, Death Certificate**

**34.** On July 21, 2023, I spoke with the Chief Nurse in the Operating room who opened the nursing notes of the AF patient upon my request. In the process, separated by about two feet , she looked directly at me and stated, " after the code I went to Guinn and asked her if she had given the AF patient epinephrine [before the code]". Dr Muller later stated in his letter of July 27, 2023 and July 28, 2023, that"speaking with staff" was a reason for the summary suspension and stated specifically that I was prohibited from "conducting my own investigation." **Exhibit 40, Muller Letter July 27, 2023, Exhibit 41, Muller letter July 28, 2023**

35. On July 28, 2023, Plaintiff requested a copy, but only received a partial copy, of the medical record. Those partial records included a face sheet devoid of the diagnosis of heart disease.

Those partial medical records included false documentation of ventilator management by Dr Singer but no documentation that entries had been removed from the record. With a copy of medical records given to me from the medical records department I went to the staff lounge and made photos of the electronic medical record that may indicated criminal activity including possible fraudulent billing to Medicare. Exhibit 42, Face Sheet

36. All the physician members of the trauma surgery department were assigned to the AF Patient's care team suggesting the trauma service had been "activated" which may have resulted in a higher paying CPT codes billed to Medicare.

37. In the medical record, Dr. Singer is noted to have performed an intubation, ventilator setup and management on the AF patient. However, Dr Singer did not intubate this patient nor was the patient ever on a ventilator. Medicare attributes use of a ventilator on the Anesthesia Machine as part of the Anesthetic, **Exhibit 42 Hospital Face Sheet, Exhibit 43, Sonoma EMS Director email**

38. The Face Sheet of the AF patient medical record lists the discharge diagnoses and is devoid of any mention of sepsis, heart problems, valvular heart disease , coronary artery disease, or aspiration as part of the esophageal intubation during the code. Aspiration is considered to be a hospital acquired condition and may result in a reduced rate of payment from Medicare. **Exhibit 23, Hospital Face Sheet**

**Autopsy and Cremation**

39. I called the Sonoma County Sheriff Coroner's office about 17:30, July 20.2023, and was told that Michelle Vaughn had already communicated with the Sonoma County Sheriff Coroner's office. The **Coroner's Intake Form documents that Ms. Vaughn stated** that the cause of death was not due to the surgeries , was due to the decedent's underlying conditions , and that Dr. Singer intended to complete the death certificate. There was no mention of possible malpractice nor need for an autopsy. **Exhibit 32 Report of Death Form, Exhibit 34 Coroner Intake Form**

37. The Coroner's Office was contacted again on the 24th of July 2023, for consent to transfer the body outside the jurisdiction of the Sonoma County Sheriff for immediate cremation at the Tracy Memorial Chapel. **Exhibit 32 Report of Death Form**

38. Within the medical record the hospital's hand written Report of Death Form had been altered to indicate that a previously scheduled autopsy had been canceled. There was no written attestation as to who or when those changes were made. However, Michelle Vaughn's signature in the medical record attests to communications with the Corner , including the Report of Death Form. The Coroner's Intake form further attests to communications with the Corner. Michelle Vaughn was also in the operating room during the code. **Exhibit 32, Report of Death Form Exhibit 34 Coroner Intake Form, Exhibit 35, Code Record - MV**

39. Months after the patient's death I obtained a copy of the Coroner Intake Form and the Death Certificate. Both may be consistent with fraud as a false report was made to the state of California

which may be Fraudulent statements in healthcare matters. **Exhibit 39 Death Certificate, Exhibit 34, Coroners Intake Form.**

40. My note to the Coroner and the Death certificate were both visible though EPIC the electronic medical record but had been removed from the medical record disclosed to me in discovery. Removal of these documents from servers maintained by EPIC or Providence may require the assistance of the IT department or approval of the Providence Administration. Each action may have required a wired transmission to and from those individuals that maintain those servers. Both incomplete printed version of the AF Patients medical records were submitted to the state of California – Health Department to certify the death and to the medical board as required in the 805 statue. Neither of these records have been produced as part of discovery. **Exhibit 36, Note to the Coroner, Exhibit 39, Death Certificate**

**AAMGI Termination**

41. Approximately one hour after the death of the patent I found an immediate termination notice in my email indicating the Anesthesia Control (AC ) person , Dr Ogunkoya , had stated this was my "last day covering for AAMGI". A subsequent email from the Medical Staff office requested that I withdraw my application for privileges. **Exhibits 44, Fired by AAMGI**

41. Dr. Ogunkoya's action ended my assignment and, as I explained to Aiken and Bauer, prevented me from continuing work at SRMH through Maxim whose contract with me included a restrict convent. Aiken's later written communication states there was no chart reviewed. Additionally, I did not receive notice or charges prior to the termination. **Exhibits 45 Aiken Emails**

42. During the July 25 telephone conversation with Aiken and Bauer, I reported Dr. Ogunkoya's esophageal intubation and explained that my assignment had already been terminated. I submitted no written resignation , did not voluntarily resign from a continuing assignment and could not return as the contract with Maxim was likewise terminated. My contemporaneous notes and related communications appear in **Exhibit 25, Aiken Emails**

43.On July 26, Aiken offered a virtual committee statement conditioned on reversing what he characterized as relinquishment by July 28. On July 27, I requested chart review and stated that my association had been severed July 20. On July 28, Aiken advised that the committee would not meet. Exhibit 25.

44. No AAMGI hearing occurred with me present. Aiken's July 27 email acknowledged that there had been no records review.

45.Dr Aiken subsequently submitted an 805 report to the California Medical Board stating that I resigned under investigation which was a knowingly false statement. I dispute that description: the July 20 termination preceded the alleged resignation, and my July 25 statements addressed an assignment already ended. I have no knowledge of the associate documents AAMGI submitted with their 805 reporting. Exhibits 26, AAMGI 805 From

46..On July 28, SRMH withdrew approval for my services. It is my opinion that SRMH withdrew approval for my services because of its exclusive agreement with AAMGI. It is also my opinion that the chronology and communications support my conclusion.

**SRMH Investigation Records access and hospital proceedings**

*47.* I re-reviewed the medical record though EPIC in the physicians lounge from July 20th thought the 24th and was surprised to find evidence of possible healthcare crimes. I took selected photos of records and on the July 28, 2023, received a copy of the medical record from the medical records department. *after being told by the pharmacy supervisor that I was not entitled to records pertaining to Dr Singers order for epinephrine. In 44 years of medical practice or the prior 4 years of medical school I had ever heard such response form a hospital department head.*

30. July 27, 2023, I received a written correspondence from Dr Muller announcing the investigation, stating that I had only entered two notes in the chart – a preoperative note and note to the coroner. Dr Muller acknowledged the firing on July 20, 2023, and complained that I was on hospital grounds following July 20th in spite of the suspension and complained about me speaking to nursing staff. He stated that the summary suspension was imposed because of my activities on July 21, 2023, by speaking to the nursing staff. Exhibit xx , July 27 Muller Letter, Exhibit xx Anesthesia Notes

31.Dr Muller in the July 27,2023 correspondence urged that I write additional addendum notes. However, I previously entered a total of five addendum notations in the chart documenting the events that occurred in the operating room the day of the patient's surgery. The addendum notations were completed July 20th through the 25th, of 2023. At the time of writing his letter I had made five medical record entries in the AF medial record.

32. The day after AF's deathI went to review the chart and photographed relevant parts of the record including; altered notes, my note to the coroner and preoperative note. I was surprised by the altered Report of Death Form that cancelled the autopsy and several false statements made by Michelle Vaughn, R.N. Because of such concerns including possible criminal acts. I photographed relevant portions of the medical record and requested a copy of the chart from the Medial Records Department. However, I received only a partial medical record and to date have not received the complete medical record despite multiple requests for production. Exhibit 22, Report of Death Form

53. I received notices of investigation dated July 26 and July 27 and a summary-suspension notice dated July 28. At approximately 10:30 on July 28, the medical-records department released AF's records to me after I signed for them. Exhibits 27-28, Muller Letter of 27 and 28

54.The summary suspension notice documented that triggering events occurred on July 21, 2023. Because of my seeking records on the AF patient who was subjected to multiple acts of substandard treatment, I was banned for the campus. Exhibits 28

55. I obtained those copies through the hospital's release process. My purpose was to review the care I provided, respond to the investigation, and address concerns of criminal activity.

56. AF's prior cardiac studies were accessible through EPIC's cardiology tab on the main page of this patient's records when such records were accessed. I located those records with minimal effort prior to evaluating the patient, during my initial review. EPIC provides immediate access to prior outpatient care, prior procedures, and complete hospitalization records.

57.The documented mitral stenosis materially changed the assessment from isolated aortic valvular disease to combined valvular heart disease with blood inflow and outflow obstruction, This type of valvular heart disease has the highest morbidity. In my medical opinion, that combination, together with coronary disease and ventricular dysfunction, substantially increased this patient's perioperative risk which I conveyed to the patient in my initial preoperative note. That note was subsequently removed for the medical record. The removal of records from the EMR requires authority and endorsement possibly of the Providence IT department or member of the medical staff with higher level access.

58.During the MEC interview, members disputed the diagnosis of mitral stenosis and other documented findings- Liver disease and alcoholism. Members also took the position that the relevant record was limited to the current hospitalization. That approach excluded prior studies directly relevant to AF's condition. I have requested the recording of that meeting several times so their statements could be compared with the underlying records. To present date I have not received that requested discovery. +Exhibit 29, Lopez Request for Recordings

59.I preserved photographs of chart entries and available revision histories, including Dr. Ogunkoya's July 24 revisions, Dr. Thomas's note, and Dr. Singer's postoperative documentation. Complete audit histories are in sole possession of the MEC and remain necessary to determine authorship, timing, access, and changes. Exhibit 30 Request for Disclosures

60.I requested audit records and MEC recordings in 12 written communications. Available access logs may identify who accessed the chart, when, and which records were opened; recordings may establish what committee members said and considered. This was relevant as Dr Muller in his letters from the 27th and 28th of July 2023 had stated the medical record had been reviewed and that he was speaking on behalf of the MEC. Yet the expert had no knowledge and could not comment on the patients coronary artery disease. Exhibit 31 Lopez Request for Recording and Records

61.Before the August 4 meeting, I supplied exculpatory real-time vital-sign images contradicting the allegation of hypotension at extubation. My request for the recording of that disclosure have not been produced by the MEC. The same exculpatory information was given to the California Medical Board who thus far has chosen not to charge or issue adverse findings against me despite the 805 submission from SRMH. Exhibit 33 Self Extubation Minute to Minute View.

62.Dr. Hodes, an anesthesiologist and immediate past AAMGI president, participated in the MEC and peer review committee. His role in the review and distribution of AF's medical records are relevant to whether the complete medical record was ever reviewed or given to AAMGI , the MEC , and more importantly to the expert. The expert specifically questions the presence and contribution of cardiac factors in the patient's demise and he had no knowledge of such. Exhibit 34, MEC Minutes

63.At the August 8 meeting, members disputed mitral stenosis, liver findings, and the number of my chart notes. Dr. Ferrari had a note read to him without having reviewed the chart. Dr. Dhu relied on the later flawed echocardiogram and stated that four local cardiologists agreed that no Mitral Stenosis existed on that flawed study. Dr. Muller disputed liver disease and Dr. Houghton disputed mitral stenosis and the reasons for not starting a central line, which in this condition of severe bivalvular heart disease and severe coronary artery disease would most likely have caused a terminal arrythmia. All of the statements made above by the MEC conflict with the AF Medical Record or the Standards of Care for this type of heart disease. I have requested the exculpatory recordings of this meeting, but they have not been produced.

64.Dr. Robert White questioned whether epinephrine was present in irrigation fluid. He is Dr. Courtney White's father. His participation warrants examination of impartiality. The dispensing record and Nurse Guinn's exchange establish a medication inquiry requiring investigation; neither alone proves epinephrine was placed in irrigation fluid. Rather than recusing himself according to the bylaws Dr White voted during each MEC meeting. Exhibit 35, MEC Meeting Minute's

65.Dr. Multiple conflicted decision makers were on the MEC or appointed to the JRC. Dr. Kang, who , for information and belief and his own admission, participated in reviewing the Transthoracic ECHO of 2022, with Dr Dhu, was appointed to the hearing panel and later withdrew. Dr. Visiliakus, who interpreted the disputed 2022 echocardiogram, was appointed JRC chairman and also later withdrew. I do not infer their reasons for withdrawal from timing alone.

**Expert review – basis of action with proctored cases**

66.The expert, in the absence of cardiac factors, identified hypotension and hypoxia (caused be an esophageal intubation) and failure to recognize an esophageal intubation as a deviation from the standard of care that likely caused of death of the AF patient. The esophageal intubation was performed by a member of AAMGI, Dr Ogunkoya. Dr Ogunkoya also failed to recognize that he had placed the endotracheal tube into the patient's esophagus. The esophageal intubation, however, was immediately recognized by me and Dr. Lowry, who corrected Dr Ogunkoya act while I continued

to direct the code.. There was no delay in the resuscitation efforts as the Realtime Vital signs demonstrate and the medical record verifies that ACLS efforts began with the first indication – loss of consciousness, Exhibits 36, North Gauge Expert Report, **Exhibit 19 Anesthesia Note, Exhibit 30, Dr OgunKoya Note, Exhibit 31 Dr Lowery Note,**

67. Dr Ogunkoya performed the esophageal intubation and failed to confirm the proper location of the endotracheal tube. The MEC's actions relied upon the Experts report, according to their NPDB entry. The expert states in his report that he did not receive information about coronary artery disease. That is evidence that the MEC did not provide the complete medical record of the patient to the expert and has, thus far , not produced the records sent to the expert. The complete medical record documented severe coronary artery and bivalvular heart disease, both Aortic and Mitral. Exhibit 37, Transthoracic ECHO and Heart SCAN Notes 2020.

68.Provision of compete medial records is customary in hospital peer review proceedings based upon my experience and observations as a doctor. Provision of the entire medical records to experts and physicians who perform peer review activities , is necessary to ensure an accurate assessment and a fair process.

69.The original expert report reflected incomplete information concerning AF's cardiac factors and associated condition.

70.The North Guage Report expert criticized moving the patient from the OR table to the hospital bed. However, surgery was performed on a fluoroscopy table which did not allow ventilation in the sitting position for this obese patient as required by the standard of care. Had the expert been given Dr Kaplans Opertive Report he may have not made this comment. **Exhibits 38, Dr Kaplans Opertive Note**

The Exert Report is cited both in the 805 submission to the California Medical board and to the NPDB as the single motivating factor in submission of both reports and the Administrative Process, The Report is contravened by the medial record and flawed by factually deficient statements.

71.My allegation that the MEC manufactured and caused a materially misleading revision expert report is based upon the facts stated above and on the removal from the chart of my chart note to the coroner. My chart note to the coroner, by statue, may have required a referral of some of the Defendants to the California Medical Board (BPC Code 802.5) .

This note to the coroner and death certificate were removed from the medical records submitted to the California Medical Board and the versions currently released through the Medical Records Department and those records produced to date through discovery, The document Exchange may be a violation of PC 134. Exhibit 34-35-36, BPC Code 802.5, Anesthesia Note to the Coroner, PC 134.

72. During the September 14, 2025 MEC meeting , Dr Hodes as a member of the MEC and anesthesiologist. made the disclosure that no quantitative monitor existed within the operating room and as a consequence the MEC requested the expert to revise his report. The expert revised his report. In his revised report he made a factually deficient statement by characterizing the "TOF"

(visual perception of Train of Four or "four twitches") as a **quantitative** monitoring. The well-respected Up-To-Date Journal, that maintains current recommendations on standard of care, by definition, states "....Visual or tactile evaluation of the TOF ....[is] **qualitative** monitoring....subjective monitoring." Exhibit 37, Up-to Date, Aug 23, Monitoring Neuromuscular Blockade

73. MEC disclosures indicate that Dr. Hodes, as a member of the peer review commit, knew quantitative monitors were unavailable in the operating room when records were released to the Medical Board ; the MEC's receipt of and adoption of the expert's initial report ; at the time the expert's initial report was used to recommend suspension of privileges; at the time of the report made to the NPDB; and at the time of the 805 report was submited to the California Medical board.

74.My preoperative consent, including the possibility of death, the note itself and my note to the coroner are absent from the current version of the Medical Record. Disclosure of Audit Logs showing the "Who accessed, What records were reviewed, Where they were sent and How and upon who's authority this occurred" are in the solitary possession of the MEC , have been requested and have yet to be released. The fair hearing has been delayed without an agreed upon stay; the notice of charges contains proctoring evaluations, though the MEC Defendants admit those charts were not reviewed. There has been no meaningful response to requests for further disclosure of records. Exhibit 38, Attorney Correspondence

75.The removal of information from the medical record of AF required EPIC audit, export, and electronic transmission of records between the hospital and EPIC servers. I cannot establish from missing pages alone that Providence IT altered or assisted in altering server data or that SRMH administrators authorized deletion. However, not even the existence of valvular heart disease appears in the discharge diagnoses on the face sheet of this patient's record. Exhibit 36 Face Sheet

76.The discharge diagnoses on the face sheet of the medical record omits aortic stenosis, mitral stenosis, aspiration associated with the disputed airway event. These omissions matter as to the events and accuracy of the account of AF's death. Whether the hospital acquired complication of aspiration would have affected Medicare payment requires the actual coding, claim, and payment records.

77. In the MEC's May 27, 2026 written communication, it is stated that "...the medical record of the 7 proctored cases had not been reviewed..." I rely on that specific admission. I have not received those patients' records, and my EPIC access ended July 31, 2023. Exhibits 4–5 and 37.

78.I repeatedly requested a fair hearing, relevant records, and MEC recordings. Counsel twice requested clarification of the charges. Proceedings were repeatedly postponed, and requests for written proof of my consent to the disputed delays went unanswered. Exhibit 37.

79.Outstanding materials include MEC recordings, complete clinical records, recording of MEC Meetings, real-time vital signs, expert correspondence, transmission inventories, audit logs and version histories, and the AAMGI–Maxim and AAMGI–SRMH agreements. Exhibit 38 separately identifies hospital-hearing requests and federal discovery.

**Notice of Charges**

80. All versions of the Notice of Charges,  first received November 14, 2023, were sufficiently vague as to preclude the construction of a defense. The phrases "concerns and statements" were found throughout  the documents as well as numerous contradictions and misstatements – no specific facts or statement were listed that would allow me to construct a defense.

81. For example  in thenotice of charges  I  was accused of over sedating the patient as it is stated that the patient "could not be cleared of sedation" but  on page 4 I was accused of insufficiently sedating the same patient such that he had to be restrained.

81.I requested clarification of the charges in two different requests, each by separate counsel , so as to clarify the vague notice of charges but those requests were ignored by the MEC.

83.I am accused of bizarre behavior because I returned to the campus after Dr Aiken told Dr Muller I moved to Los Angeles. The July 27 request to supplement medical record entries required the use of onsite computers as remote access was locked down 4 days postmortem per EPIC protocol

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on, Oct 16, 2026, in Los Angels County, state of California

/s/ Charles R. Williams, M.D.
Plaintiff