Gary Sherrer (SBN 113047)
**LAW OFFICE OF GARY SHERRER**
875-A Island Drive, Suite 403
Alameda, California 94502
Telephone: (510) 421-2838 | Facsimile: (510) 217-3930
Email: gsherrerlaw@gmail.com

Attorney for Plaintiff Charles R. Williams, M.D.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CHARLES R. WILLIAMS, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>SANTA ROSA MEMORIAL HOSPITAL, aka Providence Santa Rosa Memorial Hospital ("SRMH"); et al.,<br><br>Defendants. | Case No. 3:25-cv-06118-SI<br><br>**AMENDED DECLARATION OF CHARLES R. WILLIAMS, M.D. IN SUPPORT OF OPPOSITION TO DEFENDANT AAMGI'S 12(b)(6) MOTION TO DISMISS**<br><br>Date: December 4, 2026<br>Time: 10:00 a.m.<br>Ctrm: 1, 17th Floor<br>Judge: Hon. TRINA THOMPSON |

I, Charles R. Williams, M.D., declare:

**Qualifications and Personal Knowledge**

1. I am Plaintiff, a California physician licensed since 1983 and board certified in anesthesiology and pain medicine. My relevant experience includes prior practice in emergency medicine and in cardiac anesthesia. I have practiced over 30 years without adverse action by the eight state medical boards that licensed me. Exhibit 1, Dr. Williams CV, State Licensure

2. This declaration is based upon on my observations, personal communications, identified records, experience and medical training. Where I express an opinion or inference, I identify its basis.

**Assignment, Evaluations, and Patient Care**

3. I began providing anesthesia at the Santa Rosa Memorial Hospital ("SRMH") on , July 18, 2023, through the Maxim staffing Agency. My agreement, dated June 30, 2023, states my compensation and assignment terms. AAMGI held SRMH's exclusive anesthesia contract and contracted with Maxim Staffing Agency. Exhibit 2, Conformation of Assignment and Exhibit 3 , Maxim Contract

4. On the July 20 , 2023, I was fired , without pre or post incident notice or hearing, after the death of patient AF who expired following a contraindicated surgery. I was summarily suspended on July 28, 2023, for "conducting my own investigation" into the matter and to limit my access to the medical records and staff. The Peer review process has been and is being done with conflicted decision makers, vague and conflicted notice of charges, ignoring some and not releasing other exculpatory information. The conflicted decision makers include, but are not limited to , one with a financial interest in the outcome, one whose son has a financial and professional interest in the outcome and two other members of an exclusive contract potentially expose to personal and corporate sanctions. I received notice of charge for revocation of privileges on November 14, 2023. Exculpatory information was and continues to be withheld and there has not been full disclosure in response to multiple discovery requests. The Fair Hearing has been delayed indefinitely without written confirmation of consent to stay the proceedings and bylaws regarding recusal have been violated. Defendants have admitted that there was no chart review in 7 of the 8 cases appearing on the Notice of Charges.

5. In compliance with credentialing policy I performed seven proctored cases, on July 19 and 20 of 2023, and all evaluations were  rated "acceptable" for skill and competence. Nevertheless, they appeared, in the initial Notice of Charges issued on, November 14, 2023, and the two amended versions of the Notice of Charges despite MEC Defendants' admission that none of the medical

records of those proctored patients had been reviewed. Exhibits 4, Proctored Cases and Exhibits 5, Notice of Charges, Exhibit 6 , Letter May 27, 2023

6. On July 20, 2023, I provided anesthesia to Patient AF, who died in the operating room 40 minutes after an absolutely contraindicated laparoscopic appendectomy. The North Gauge Expert Report, obtained by the MEC and dated August 14, 2023, confirmed that the expert had no knowledge of the AF patient's severe cardiac disease and further confirmed that the expert did not receive the patient's complete medical record. More than Twelve months later, on August 26, 2024, the expert revised his report and intentionally made factually misleading statements. Contrary to his original report stating ' a quantitative monitor should have been used as the standard of care,' he revised his report to misleadingly state that the ' train of four' monitor, a known qualitative monitor, was the quantitative monitor that he referenced in his initial report, over one year earlier. He had not been provided with the complete medical record. Exhibit 7, North Gauge Report 2023/2024, Exbibit 46 Up-to Date, Monitoring Neuromuscular Blockade Article

7. The clinical events below preceded my immediate termination, the subsequent disciplinary proceedings, the charges , and North Gauge expert report. Exhibit 8, Summary Suspension

8. The electronic Medical Records of AF, available on July 20, 2023, confirmed the patient was in the emergency room a total of 9 hours; that he was a 68 year old obese male, hypertensive, diabetic, had heart failure from multivalvular heart disease, and had documented falling vital signs. The emergency room (ER) medical records within 30 minutes of admission to the ER documented evidence of sepsis (infection in the blood) , low albumin, pancreatitis , and low potassium level was evident. Within three hours after arrival to the ER, a CT Scan of the Abdomen confirmed a perforated appendix and evidence of peritonitis. This combination of studies confirmed a life-threatening surgical emergency. In my opinion most students in American medical schools are taught to recognize this life-threatening condition and to provide critical presurgical treatment by their second or third year of medical school. The medical record confirms this patient never received any critical care medical services in the ER. Exhibit 9, ER Vital Signs, Exhibit 10, CT Scan ABDOMEN, Exhibit 11, Dr. Thomas Note (Altered)

9. In spite of the need for stabilization and critical care services, Dr. Thomas , the emergency room physician , documented that “no critical care services were delivered.” Exhibit 11 Dr. Thomas Note, (Altered)

10. The emergency room medical record further confirms that no critical care service was delivered in spite of the patient’s deteriorating condition. In my professional opinion the failure to provide critical care services and continued decompensation contributed to this patient’s death 12 hours later...” Exhibit 11 Dr. Thomas Note, (Altered), Exhibit 9 ER Vital Signs (falling)

11. In spite of the patient’s medical record documenting hemodynamic instability and need of critical care services none were provided. Following the patients death, Dr. Thomas altered his medical record entries by adding the statement which referred to the AF patient was transferred “stable to the OR.” This alteration of the medical record falsely indicates there was no need for critical care services, including hemodynamic stabilization (of falling vital signs). Exhibit 12 Thomas Note (Unaltered) Exhibit 11, Dr. Thomas Note, (Altered)

12. The record documented that it was not until around the sixth hour of presentation to the emergency room that Dr. Thomas even called a surgeon. The surgeon, Dr Courtney White, was called but never came the ER to evaluate the AF patient but gave telephone orders to obtain a consent for a contraindicated Laparoscopic Appendectomy and also ordered contraindicated medications for this patient with a perforated bowel (perforated Appendix). The contraindicated medications consisted of orders for oral laxatives which might cause further leakage of fecal material out of the perforated bowel into the abdominal cavity. The record provided to date does not document whether the patient received that ordered laxative treatment nor is there evidence that Dr. Courtney White ever interviewed or examined the patient, ever wrote a note in the chart or cosigned his verbal orders. Exhibit 13, MAR (Medication Administration Record)

13. Dr Mathew Singer, Dr Cortney White’s associate, was the second surgeon participating in this patient’s care. Dr Singer however did not see the patient until around the eighth hour following

presentation to the emergency room. This surgeon documented in his admission note the falling vital signs, which confirmed hemodynamic instability. Exhibit 15, Dr. Singers Admitting Note

14. The documented Hemodynamic instability was an absolute contraindication for a laparoscopic surgery. However, Dr Singer chose to perform the higher paying laparoscopic appendectomy rather than the indicated, shorter and less invasive, open appendectomy which was the standard of care. Exhibit 16, Singers Opertive Note, Exhibit 17 , Contraindications to Laparoscopic Surgery

15. Additionally, this patient had other relative contraindications to Laparoscopic Surgery including Peritonitis (infection of the peritoneal cavity). Exhibit 18 Contraindications to Laparoscopy

**Operating Room**

16. Dr Singer's operative reports confirmed, as did Plaintiffs physical exam , that the patient suffered with peritonitis – a surgical emergency. Dr Singer's Operative Report documents, and Plaintiff saw, both pus with fecal contamination across the intestines within the abdominal cavity. Exhibit 19, Anesthesia Note, Exhibit 20, Abdominal Pain in Adults

17. The first documented antibiotic was not given until approximately five hours after arrival to the ER. Exhibit 13 MAR

18. Dr. Thomas, the Emergency Physician, states in his admitting note, of July 20, 2023, that no critical-care service was delivered and ,in a later version of the ER medical record, adds the phrase that the patient was "stable to OR." That description conflicts with the recorded vital sign deterioration and misleadingly supports the patient's inappropriate hospital admission to an unmonitored hospital bed. Complete audit records have been requested and are needed to establish who and when each alteration of the medical was made. Such information has not yet been disclosed. This may have been a violation of 42 UC 1395dd, and a repeat EMTALA violation (Federal Law requiring stabilization of emergency room patients). Exhibit 12, Thomas Note, (Altered), Exhibit 21, 42 USC 1395dd

19. Dr. Courtney White, the Trauma Surgeon and admitting physician gave telephone orders including an order to obtain a consent for laparoscopic appendectomy and an order for laxative medications. The records do not document informed consent as there is no record of his interview and evaluation of the patient ,or required counter signature of his orders nor a signed consent for the treatment with contraindicated medications. Exhibit 13, MAR

20. Dr. Singer, Trauma Surgeon and Intensivist, saw the patient on the morning of July 20, 2023 documented the unstable vital signs. Dr. Singer never obtained informed consent for a Laparoscopic Appendectomy nor did he ever document the patient's severe heart disease including the diagnosis of Aortic Stenosis, Mitral Stenosis , 100% Occlusion of the Right Coronary artery, or Akinetic/ Dyskinetic (abnormal) heart muscle contraction. These conditions were documented in September 2020 Transthoracic ECHO, Heart Scan and was immediately available through the electronic medical record ( EPIC ). Like his colleagues, Dr.'s Thomas, Kaplan, White and Vasiliauskas, the diagnoses of Mitral Stensosi, 100% blockage of the Right Coronary Artery and Akinetic/Dyskinetic (abnormal) heart muscle contractions were not mentioned in their notes or addressed in their care plan or interpretation of diagnostic studies. The Medical record clearly documents an echocardiogram interpreted by Dr Vasiliauskas, Cardiologist, in October 2022, which was flawed and had documented poor acoustic windows (could not see into the heart). However, Dr. Vasiliauskas, characterized the mitral valve as normal without cautionary mention of the flawed study. These findings required reconciliation. Exhibits Exhibit 15, Dr Singers Admitting Note, Exhibit 22, Transthoracic Echo 2022, Exhibit 23, Transthoracic Echo and Heart Scan 2020

21. The Urologist, Dr Kaplan had performed several urinary diversion procedures for chronic kidney stones in this patient prior months, had previously ordered a cardiac clearance for surgery but like his associates failed to mention this patient's severe heart disease, both Aortic and Mitral Stenosis. Exhibit 24 , Kaplan Admitting/Opertive Note

22. In the operating room, Dr. Singer refused to perform an open appendectomy and proceeded with a laparoscopic procedure after being informed of the patient's multi valvular heart disease, Aortic and

Mitral Stenosis, the latter of which he never documented in his admitting note or addressed in his care plan. Without this documentation it is unlikely that the AF patient received complete disclosure of risks or gave informed consent for the surgical procedure performed. Exhibit 25 Anesthesia Addendum Notes, Exhibit 15, Dr. Singers note, Exhibit 23, 2020 Transthoracic Echo

23. Before the surgery, I questioned Dr. Singer about the surgical procedure, in this patient with Aortic Stenosis, which is known to predispose to Sudden Death. Dr. Singer responded, “Don’t worry, it’s not for you.” Exhibit 25, Anesthesia Pre Operative Note, Exhibit 26, Anesthesia Addendum Notes - 5

24. Dr. Singer likewise did not perform a customary peritoneal washout despite observations of fecal contamination and pus documented within the abdominal cavity. Exhibit 16, Singers Opertive Note.

25. Resuscitation efforts were required throughout the Anesthetic and at its midpoint the Realtime vital signs showed signs of acute heart failure with decompensation (pulse pressure variation). The blue inverted T’s are the systolic arterial pressure.- in the pictural exhibit. As can be seen a “Roll-a-Coster” pattern (1, 2) is followed by a drop in blood pressure due to acute heart failure. This pattern is known to often precede a cardiopulmonary arrest. In order to AVOID a cardiopulmonary arrest the Train of Four (four visible twitches with stimulation or TOF) monitor was checked. That monitor confirmed an adequate status (four of four visible twitches). The reversal agent was quickly given and the return of spontaneous ventilation (3) and stabilization of the blood pressure followed thereafter (5). The heart strength, under the pressure of the laparoscopic surgery, and weakened by the anesthetics, was insufficient to tolerate positive pressure ventilation (use of the ventilator). This exculpatory information refutes that outside expert’s statement that procedures followed prior to extubation were insufficient to ensure adequate respiratory function as the AF patient had been spontaneously ventilating though the latter half of the surgery. The expert’s report stated “the case involved an uneventful anesthesia until extubation – he was not given all of the records or disclosures Plaintiff delivered to the MEC prior to their August 4, 2023 meeting. Exhibit 27 Realtime Vital Sings - PPV

26. With wound closure, the anesthetic was lightened, the patient awoke, had to be restrained, and self-extubated. The endotracheal tube was dislodged, from the trachea and correspondingly the respiratory rate fell from 22 to 15 breaths per minute. I removed the dislodged tube from the patient's mouth. Over the next 20 minutes the patient remained conscious, was breathing spontaneously and responsive to verbal stimuli. Only upon loss of consciousness , one of the standard indications for ACLS resuscitation, were the resuscitation efforts initiated. This exculpatory information is documented in Dr Ogunkoyas' chart entry and refutes the expert report stating "there was a delay in the re-intubation and resuscitation...patient expired as a result of the [this] deviation from the standard of care..." The Blood pressure was normal at the time of self extubation and removal of the endotracheal tube as demonstrated in the exculpatory Realtime vital signs shared with the MEC on August 2, 2023. Exhibit 28, Realtime Vital Signs, Self Extubation, 08/02/23, Exhibit 29, Realtime Vital Signs California Medial Board, Exhibit 30, Dr Ogunkoya Note, Exhibit 19, Anesthesia Note , Exhibit 31, Dr Lowrey's Note

**Code**

27. At the beginning of resuscitation, I observed Dr. Ogunkoya perform an esophageal intubation that was recognized and corrected in less than a minute. Both myself and Dr Lowery simultaneously observed gastric-fluid in the endotracheal tube which was removed and replaced. Two physicians immediately recognized esophageal intubation and it was corrected. Dr Ogunkoya, Dr Lowry and Dr. Williams chart entries refute the expert report stating "there was a delay in the intubation and resuscitation...patient expired as a result of the [this] deviation from the standard of care..." The expert was not given the entire medical record to review. Exhibit 26 Anesthesia Adendum Notes, Exhibit 19, Anesthesia Note, Exhibit 31, Dr Lowery Airway Note , Exhibit 30, Dr Ogunkoya Note

28. The patent never recovered consciousness, or a viable oxygen saturation or viable blood pressure following the esophageal intubation and death was pronounced by Dr Singer at 14:42. Death was

pronounced 20 minutes following the start of resuscitation efforts and 40 minutes following the end of surgery.

29. The North Guage expert commentary, in all versions, state "... I can not comment on a cardiac etiology for the patients demise..." as he was not given the full medical record including all medical record entries, the transthoracic echo from 2020 and heart scan showing Akinesis/Dyskinesis of the left ventricle, 100 % occlusion of the right coronary artery and the mitral stenosis with valve area on 1. 8 cm2 (normal area 4-6 cm2) . Exhibit 23, 2020 Transthoracic Echo and Clinical Notes

30. The medical record documents that Nurse Michelle Vaughn, R.N., participated in the AF patient's care before and after the surgery. However, on the Report of Death Form, in which communications with the Sheriff's Coroners Office are documented, evidence of record alteration exists where the Autopsy box was checked then "scratch out." There was no legal attestation of who or when the alteration was made. Additionally, days later authorization from the Sheriff was sought, again under false pretenses, to transfer the decedent out of the jurisdiction of Sonoma County to Tracey Memorial Chapel in San Joaquin County for cremation. Exhibit 33 SRMH Report of Death Form, Exhibit 34, Permit for Disposition of Human Remains, Exhibit 32 Code Record - MV

31.The Coroners Intake Record documents that Michelle Vaughn R.N., falsely stated that the AF patient died after prescheduled surgery rather than emergency appendectomy, that no malpractice occurred and that Dr. Singer intended to execute the legal task of completing the death certificate. Exhibit 35 Coroners Intake Form, Exhibit 32 Code Record- MV

32.Plaintiffs note to the coroner, written after and citing the cause of death, was removed from the medical record. According to BPC 802.5 it may have required an autopsy and subsequent referral to the State of California Medical Board. The copy of the medical record given to the State of California Medical Board as a required part of the 805-report was incomplete and did not contain Plaintiffs Note to the coroner, preoperative note in which Plaintiff documented informed consent including the risk of Death. Likewise, Medical Board of California was never given the patient's Death Certificate, which falsely documents a place of and cause of death. The SRMH 805 report was signed by Chief of

Staff Dr. Muller and hospital CEO Chuck Kassis. This act may have been violation of several state and Federal laws. Exhibit 36, Anesthesia Note to Coroner, Exhibit 37 BPC 802.5, Exhibit 38, California Government Code 27491

33.Likewise, The Death Certificate, signed under oath by Dr Cooper and submitted to the Sonoma County Health Department, in section 102 falsely documents the patient died in the ER as an OP (outpatient) and that no surgery had been performed. These acts may have been. A violations of Federal Statues concerning Fraud in Healthcare Matters. Exhibit 39, Death Certificate

34. On July 21, 2023, I spoke with the Chief Nurse in the Operating room who opened the nursing notes of the AF patient upon my request. In the process, separated by about two feet , she looked directly at me and stated; " after the code I went to Guinn and asked her if she had given the AF patient epinephrine [before the code]". Dr Muller later stated in his letter of July 27, 2023 and July 28, 2023, that "speaking with staff" was a reason for the summary suspension and stated specifically that I was prohibited from "conducting my own investigation." Exhibit 40, Muller Letter July 27, 2023, Exhibit 41, Muller letter July 28, 2023

35. On July 28, 2023, Plaintiff requested a copy, but only received a partial copy, of the medical record. Those partial records included a face sheet devoid of the diagnosis of heart disease. Those partial medical records included false documentation of ventilator management by Dr Singer and contained no mention of medical record  entries that had been removed from the record. With a copy of medical records given to me from the medical records department I went to the staff lounge and made photos of the electronic medical record that may have indicated criminal activity including possible fraudulent billing to Medicare. Exhibit 42, SRMH Face Sheet

36. All the physician members of the trauma surgery department were assigned to the AF Patient's care team suggesting the trauma service had been "activated" which may have resulted in a higher paying CPT codes billed to Medicare. Though the Sonoma county employee over the Exclusive contract for Trauma Service that SRMH had with Sonoma county denied that the AF Patient was a "trauma patient." Exhibit 43, Sonoma EMS Director email

37. On the SRMH Face (billing) Sheet, Dr. Singer is listed to have performed an intubation, ventilator setup and management for the AF patient. However, Dr Singer did not intubate this patient nor was the patient ever on a ventilator. The set up and maintenance of a ventilator justifies additional daily fees that Providence may have fraudulently billed to Medicare. Medicare attributes use of a ventilator on the Anesthesia Machine as part of the Anesthetic and is therefore not a billable service. Exhibit 42, SRMH Face Sheet

38. The Face Sheet of the AF patient medical record lists the discharge diagnoses and is devoid of any mention of sepsis, heart problems, valvular heart disease , coronary artery disease, or aspiration as part of the esophageal intubation during the code. Aspiration is considered to be a hospital acquired condition and may result in a reduced rate of payment from Medicare. Exhibit 23, SRMH Face Sheet

**Autopsy and Cremation**

39. I called the Sonoma County Sheriff Coroner's office about 17:30, July 20.2023, and was told that Michelle Vaughn had already communicated with the Sonoma County Sheriff Coroner’s office. The Coroner’s Intake Form documents that Ms. Vaughn stated that the cause of death was not due to the surgeries , however, was due to the decedent’s underlying conditions , and that Dr. Singer intended to complete the death certificate. There was no mention of possible malpractice nor the autopsy mandated by the Anesthesia note to the coroner. Exhibit 33 SRMH Report of Death Form, Exhibit 35 Coroner Intake Form

37. The Coroner's Office was contacted again on the 24th of July 2023, for consent to transfer the body outside the jurisdiction of the Sonoma County Sheriff for immediate cremation at the Tracy Memorial Chapel. Exhibit 33, SRMH Report of Death Form

38. Within the medical record the hospital’s hand written Report of Death Form had been altered to indicate that a previously scheduled autopsy had been canceled. There was no written attestation as to who or when those changes were made. However, Michelle Vaughn’s signature in the medical record

attests to communications with the Corner , including the Report of Death Form. The Coroner's Intake form further attests to communications with the Corner. Michelle Vaughn was also in the operating room during the code. Exhibit 33, Report of Death Form Exhibit 35, Coroner Intake Form, Exhibit 32, Code Record - MV

39. Months after the patient's death Plaintiff obtained a copy of the Coroner Intake Form and the Death Certificate. Both may be consistent with fraud as a false report was made to the State of California which may be a Federal violation of Fraudulent Statements in Healthcare Matters. Exhibit 39 Death Certificate, Exhibit 35, Coroners Intake Form.

40. My note to the Coroner and the Death certificate were both visible though EPIC the electronic medical record but had been removed from the "paper copy" of the medical record including the one disclosed to me in discovery and most likely on that may have been reviewed by the OIG/HHS. Removal of these documents from servers maintained by EPIC or Providence may require the assistance of the IT department (Providence) or approval of the SRMH Administration. Each action may have required a wired transmission to and from those individuals that maintain those servers and agreement and conjoined cooperation between the MEC and Providence may have been in place. There was an overall objective to the individual acts that was repeated, interstate communications occurred, and interstate commerce may have been affected. Both incomplete printed version of the AF Patients medical records were submitted to the state of California – Health Department to certify the death and to the medical board as required in the 805 statues. Neither of these records have been produced as part of discovery. Exhibit 36, Note to the Coroner, Exhibit 39, Death Certificate

**AAMGI Termination**

41. Approximately one hour after the death of the patent Plaintiff was termination by email indicating the Anesthesia Control (AC ) person , Dr Ogunkoya , stated July 20.2023, was my "last day covering for AAMGI". A subsequent email from the Medical Staff office requested that I withdraw my

application for privileges. There was no notice, hearing or investigation or as Plaintiff later discovered, review of the medical record. Exhibits 44, Fired by AAMGI

41. Dr. Ogunkoya's action ended my assignment and, as I explained to Aiken and Bauer, prevented me from using my privileges at SRMH as AAMGI held the exclusive rights for Anesthesia coverage at SRMH (Economy v. Sutter East Bay Hospitals Cal App 5th 1147,1158-1160). The MEC reminded me of this privilege restriction their correspondence including that of September 20, 2023. Dr. Aiken's written communication later states there was no chart reviewed. During the July 25th telephone conversation with Aiken and Bauer, I reported Dr. Ogunkoya's esophageal intubation and explained that my assignment had already been terminated on July 20, 2023. I did not submit a verbal or no written resignation , did not voluntarily resign from a continuing assignment and could not return as the contract with Maxim was likewise terminated. My contemporaneous notes documented this conversation. Exhibit 46, AAMGI Emails

43. On July 26, Aiken offered a virtual committee meeting conditioned on reversing what he characterized as relinquishment by July 28. On July 27, I requested chart review and stated that my association had been severed July 20. On July 28, Aiken advised that the committee would not meet. Later when asked for written proof of notice of an investigation, AAMGI counsel referred me to the MEC July 27, 2023 letter. Exhibit 45, AAMGI Defendants Letter, dated October 30, 2023

44. No AAMGI hearing occurred with me present. Aiken's July 27 email acknowledged that there had been no records review. There was no further response.

45. Dr Aiken subsequently submitted a false 805 report to the California Medical Board stating that I resigned under investigation which was a knowingly false statement. I dispute that description: the July 20 termination preceded the alleged resignation, and my July 25 statements addressed an assignment already ended. I have no knowledge of the associate documents AAMGI submitted with their 805 reporting. Exhibits 47, AAMGI 805 From

46. .On July 28, SRMH withdrew approval for my services. It is my opinion that SRMH withdrew approval for my services because of its exclusive agreement with AAMGI. It is also my opinion that the chronology and communications support my conclusion.

**SRMH Investigation Records access and hospital proceedings**

47. July 27, 2023, I received a written correspondence from Dr Muller announcing the investigation, stating that I had only entered two notes in the chart – a preoperative note and note to the coroner. Dr Muller acknowledged the firing on July 20, 2023, and complained that I was on hospital grounds following July 20, 2023, in spite of the suspension and complained about me speaking to nursing staff. He stated that the summary suspension was imposed because of my activities on July 21, 2023, by speaking to the nursing staff. Exhibit 40 , July 27, 2023 MEC Letter, Exhibit 48 MEC Meeting 08 04 23 Transcript

48. Dr Muller in the July 27, 2023 correspondence urged that I write additional addendum notes. However, I previously entered a total of five addendum notations in the chart documenting the events that occurred in the operating room the day of the patient's surgery. The addendum notations were completed July 20th through the 25th, of 2023. At the time of writing his letter I had made five medical record entries in the AF medial record.

49. The day after AF's death I went to review the chart and photographed relevant parts of the record including; altered notes, my note to the coroner and preoperative note. I was surprised by the altered Report of Death Form that cancelled the autopsy and several false statements made by Michelle Vaughn, R.N. Because of such concerns including possible criminal acts. I photographed relevant portions of the medical record and requested a copy of the chart from the Medial Records Department. However, I received only a partial medical record and to date have not received the complete medical record despite multiple requests for production. Exhibit 33, Report of Death Form

50.I received notices of investigation dated July 26 and July 27 and a summary-suspension notice dated July 28. At approximately 10:30 on July 28, the medical-records department released AF's

records to me after I signed for them. According to HIPPA regulations as a caregiver, access to the medical record was allowed. Exhibits 27 MEC later dated July 27, 2023, Exhibits 28 MEC letter dated July 28,2023

51. The summary suspension notice documented that triggering events occurred on July 21, 2023. Because of my seeking records on the AF patient who was subjected to multiple acts of substandard treatment, I was banned for the campus. Defendant admitted prevention of access to the medical record and SRMH Staff was the reason for he summary suspension rather than posing a danger to patients or staff. Exhibits 48, MEC 08 04 23 Meeting Transcript

52. I obtained copies of the partial medical records through the hospital's release process in the medical records department. My purpose was to review the care I provided, respond to the investigation, and address concerns of criminal activity.

53. AF's prior cardiac studies were accessible through EPIC's cardiology tab on the main page of this patient's records when such records were accessed. I located those records with minimal effort prior to evaluating the patient, during my initial review. EPIC provides immediate access to prior outpatient care, prior procedures, and complete hospitalization records.

54.The documented mitral stenosis materially changed the assessment from isolated aortic valvular disease to combined valvular heart disease with blood inflow and outflow obstruction, This type of valvular heart disease has the highest morbidity. In my medical opinion, that combination, together with coronary disease and ventricular dysfunction, substantially increased this patient's perioperative risk which I conveyed to the patient in my initial preoperative note. That note was subsequently removed for the medical record. The removal of records from the EMR requires authority and endorsement possibly of the Providence IT department or member of the medical staff with higher level access.

55.During the MEC meeting on September 12, 2023 , members disputed the diagnosis of mitral stenosis and other documented findings in the medical record - Liver disease and alcoholism. The members of the MEC ignored exculpatory documentation of; the Mitral Stenosis on the Transthoracic

ECHO and heart scan of 2020, The CT Scan finding of Steatosis ( Fatty Liver) and evidence of alcoholism in the Clinical Notes and a fax to Dr Patel mentioning a DUI (0.37). Dr Dhu, Chief of cardiology, reportedly had the flawed Transthoracic Echo form 2022 reviewed by four collages, all of which agreed the patient did not have Mitral Stenosis. One of those physicians, Dr Kang was placed on the JRC panel but later recused himself. The MEC's approach excluded prior exculpatory information directly relevant to AF's condition. I have requested the recording of that meeting several times so their statements could be compared with the underlying records. To present date I have not received that requested discovery. Exhibit 49, Lopez Request for Recordings, Exhibit 50, Patel FAX – DUI. Exhibit 51, MEC letter Dated September 20, 2023 Exhibit 10, CT Scan of the Abdomen

56.I preserved photographs of chart entries and available evidence of revision histories created, including Dr. Ogunkoya's July 24 revisions, Dr. Thomas's note, and Dr. Singer's postoperative documentation. Complete audit histories are in sole possession of the MEC and remain necessary to determine authorship, timing, access, and changes as well as the times and dates on which they were made. Exhibit 30 Request for Disclosures

57.I requested audit records and MEC recordings in written communications with the MEC. Available access logs were requested and may identify who accessed the chart, when, and which records were opened; recordings may establish what committee members said and considered. This was relevant as Dr Muller in his letters from the 27th and 28th of July 2023, as well as on September 20, 2023,  stated the medical record had been reviewed and that he was speaking on behalf of the MEC. Yet the expert had no knowledge and could not comment on the patients coronary artery disease. Furthermore, Dr. Ferrari, MEC member had not seen my summation note in the medical record, but had it read to him though  the teams teleconference screen. He had not reviewed the medical record, and this may have been a violation of the HCQIA requirement of a minimal effort to establish the facts. Exhibit 31 Lopez Request for Recording and Records. Exhibit  48, MEC Meeting 08 04 23 Transcript

58. Before the August 4 meeting, I supplied exculpatory real-time vital-sign images contradicting the allegation of hypotension at extubation. My request for the recording of that disclosure have not been produced by the MEC. The same exculpatory information was given to the California Medical Board who thus far has chosen not to charge or issue adverse findings against me despite the 805 submission from SRMH. Exhibit 28 Self Extubation Minute to Minute View.

59. Dr. Hodes, an anesthesiologist and immediate past AAMGI president, participated in the MEC and peer review committee. His role in the review and distribution of AF's medical records are relevant to whether the complete medical record was ever reviewed or given to AAMGI , the MEC , and more importantly to the expert. The expert specifically questions the presence and contribution of cardiac factors in the patient's demise and he had no knowledge of such. Exhibit 54, MEC Minutes

60. At the August 8 meeting, members disputed mitral stenosis, liver findings, and the number of my chart notes. Dr. Ferrari had a note read to him without having reviewed the chart. Dr. Dhu relied on the later flawed echocardiogram and stated that four local cardiologists agreed that no Mitral Stenosis existed on that flawed study. Dr. Muller disputed liver disease and Dr. Houghton disputed mitral stenosis and the reasons for not starting a central line, which in this condition of severe bivalvular heart disease and severe coronary artery disease would most likely have caused a terminal arrythmia. All of the statements made above by the MEC conflict with the AF Medical Record or the Standards of Care for this type of heart disease. I have requested the exculpatory recordings of this meeting, but they have not been produced.

61. Dr. Robert White questioned whether epinephrine was present in irrigation fluid. He is the father of Dr. Courtney White, the admitting physician. Rather than recusing himself in compliance with the SRMH bylaws Dr White voted during each MEC meeting. Dr. Robert Whites participation in these proceedings warrants examination of impartiality. The dispensing record and Nurse Guinn's exchange establish a medication inquiry requiring investigation; neither alone proves epinephrine was placed in irrigation fluid. Exhibit 52, MEC Meeting Minute's, Exhibit 48 MEC 08 04 23 meeting Transcript

62. Dr. Multiple conflicted decision makers were on the MEC or appointed to the JRC. Dr. Kang, who , for information and belief and his own admission, participated in reviewing the Transthoracic ECHO of 2022, was appointed to the hearing panel and later withdrew. Dr. Visiliakus, who interpreted the disputed 2022 echocardiogram, was appointed JRC chairman and also later withdrew.

**Expert review – basis of action with proctored cases**

63.The expert, in the absence of cardiac factors, identified hypotension and hypoxia (caused be an esophageal intubation) and failure to recognize an esophageal intubation as a deviation from the standard of care that likely caused of death of the AF patient. The esophageal intubation was performed by a member of AAMGI, Dr Ogunkoya. Dr Ogunkoya also failed to recognize that he had placed the endotracheal tube into the patient's esophagus. The esophageal intubation, however, was immediately recognized by me and Dr. Lowry, who corrected Dr Ogunkoya act while I continued to direct the code.. There was no delay in the resuscitation efforts as the Realtime Vital signs demonstrate and the medical record verifies that ACLS efforts began with the first indication – loss of consciousness, Exhibits 7, North Gauge Expert Report, Exhibit 19, Anesthesia Note, Exhibit 30, Dr OgunKoya Note, Exhibit 31, Airway Note Dr Lowery

64.Dr Ogunkoya performed the esophageal intubation and failed to confirm the proper location of the endotracheal tube. The MEC's actions relied upon the Experts report, according to their NPDB entry. The expert states in his report that he did not receive information about coronary artery disease. That is evidence that the MEC did not provide the complete medical record of the patient to the expert and has, thus far , not produced through discovery the records sent to the expert. The complete medical record documented severe coronary artery and bivalvular heart disease, both Aortic and Mitral. Exhibit 23, Transthoracic ECHO and Heart SCAN Notes 2020.

65.Provision of compete medial records is customary in hospital peer review proceedings based upon my experience and observations as a doctor. Provision of the entire medical records to experts and

physicians who perform peer review activities , is necessary to ensure an accurate assessment and a fair process.

66..The original expert report reflected incomplete information concerning AF's cardiac factors and associated condition.

67. The North Guage Report expert criticized moving the patient from the OR table to the hospital bed after the patient awakened. However, surgery was performed on a fluoroscopy table which did not allow ventilation in the sitting position as was the standard of care for this obese patient. Had the expert been given the complete records, including Dr Kaplans Opertive Report which documented the use of fluoroscopy he may have not made this comment. Exhibits 24, Dr Kaplans Admitting/Opertive Note

The North Gauge Report stating there was "a deviation from the standard of care if high concern" and the concerns raised in the proctored cases, as documented in both the 805 and National Practitioner Data Bank (NPDB) submissions by the MEC as the primary motivating factor for the Administrative Process. The North Gauge Report is contravened by the medial record and is flawed by factually deficient statements by the expert upon request from the MEC. In none of the Proctored cases had the medical record been reviewed. These actions may have violated the HCQIA (Immunity Statues), California State and or other Federal Laws.

68.. My allegation that the MEC manufactured and caused a materially misleading revision expert report is based upon the facts stated above and on the removal of Plaintiffs notes from the medical record of including the note to the coroner. Plaintiffs note to the coroner, by statue, may have required a referral of some of the Defendants to the California Medical Board (BPC Code 802.5) . I have no knowledge of the intent of these action in relation to the reaccreditation of the SRMH Trauma Program, Providence Corporate Integrity Agreement or past EMATALA Violations at SRMH.

69. This note to the coroner and death certificate were removed from the medical records submitted to the State of California Medical Board, and may be a violation of California Penal Code 134. Exhibit 37 BPC Code 802.5, Exhibit 36 Anesthesia Note to the Coroner, Exhibit 53, PC 134.

70. During the September 14, 2025 MEC meeting , Dr Hodes as a member of the MEC and anesthesiologist. made the disclosure that no quantitative monitor existed within the operating room and as a consequence the MEC requested the expert to revise his report. The expert revised his report. In his revised report he made a factually deficient statement by characterizing the "TOF" (visual perception of Train of Four or "four twitches") as a quantitative monitoring. The well-respected Up-To-Date Journal, that maintains current recommendations on standard of care, by definition, states "....Visual or tactile evaluation of the TOF [is] qualitative monitoring....subjective monitoring." Exhibit 46, Up-to Date, Aug 23, Monitoring Neuromuscular Blockade

71.MEC disclosures indicate that Dr. Hodes, as a member of the peer review commit, knew quantitative monitors were unavailable in the operating room when records were released to the Medical Board ; the MEC's receipt of and adoption of the expert's initial report ; at the time the expert's initial report and its use recommending suspension of privileges; at the time of the NPDB; and 805 report was submitted to both State and Federal Authorities.

72. Plaintiffs preoperative note contained a consent which included the possibility of death, the note itself and my note to the coroner are absent from the current version of the Medical Record. Disclosure of Audit Logs showing the "Who accessed, What records were reviewed, Where they were sent and How and upon who's authority this occurred" are in the solitary possession of the MEC , have been requested and have yet to be released. The fair hearing has been delayed without an agreed upon stay; the notice of charges contains the proctoring evaluations, though the MEC Defendants admit those charts were not reviewed. There has been no meaningful response to requests for further disclosure of records or repeated request to clarify vague the Notice of Charges. Exhibit 54, Request to Clarify Notice of Charges

73. The removal of information from the medical record of AF required EPIC audit, export, and electronic transmission of records (wire transmission) between the hospital and EPIC servers possibly across state lines. Plaintiff cannot establish from missing pages alone that Providence IT department altered or assisted in altering server data or that SRMH administrators authorized deletion. However, not even the existence of valvular heart disease appears in the discharge diagnoses on the face sheet of this patient's record which was created by employees of Providence. Exhibit 42, SRMH Face Sheet

74. The discharge diagnoses on the face sheet of the medical record omits aortic stenosis, mitral stenosis, aspiration associated with the disputed airway event. These omissions matter as to the events and accuracy of the account of AF's death. Whether the hospital acquired complication of aspiration would have affected Medicare payment requires the actual coding, claim, and payment records.

75. In the written Defendants admission, dated May 27, 2026, written it is stated, "... the medical record of the 7 proctored cases had not been reviewed... " I rely on that specific admission. I have not received those patients' records, and my EPIC access ended July 31, 2023. Exhibits 4, Proctored cases, Exhibit 6, Defendants Admission.

76. I repeatedly requested relevant records, and MEC recordings. Counsel twice requested clarification of the charges. Proceedings were repeatedly postponed, and requests for written proof of my consent to the disputed delays went unanswered. Exhibit 54, Request to Clarify Notice of Charges.

79.Outstanding discovery materials include MEC evidence reviewed, complete clinical records, recording of MEC Meetings, real-time vital signs, expert correspondence, transmission inventories, audit logs and version histories, and the AAMGI–Maxim and AAMGI–SRMH agreements, emails, records of cell phone calls regarding firing on 07/20/23 and administrative process, evidence that MEC reviewed medical record and ignored exculpatory information.

80.During the MEC meeting of August 4, 2023, Dr. Ferrari stated that anesthesia notes are done in real-time and asked "why would you not be able to just complete the record immediately after the case....." . Dr Ferrari, Director of the Emergency Room , had the Plaintiffs medical record entry, one of the many notes the MEC indicated were missing, displayed and read to him during the teams meeting. The MEC members did not review the charts of the proctored patients or the AF "sentinel" patient, before voting. Exhibit 6, Defendants Admission, Exhibit 48, Transcript August 4, 2023 MEC meeting

81, Dr. Muller stated during the August 4, 2023, meeting the reasons for the summary suspension of July 28, 2023 was to terminate my "...access to the medical record and other employees..." with knowledge of the events surround the decedents passing – not for a concern for patient or employee safety. The suspension was release after Plaintiff agreed not to return to the SRMH campus. Exhibit 48, Transcript August 4, 2023 MEC meeting

82.All versions of the Notice of Charges, first received November 14, 2023, were sufficiently vague as to preclude the construction of a defense or conflicted. The phrases "concerns and statements" were found throughout the Notice of Charges as well as numerous contradictions and misstatements. Without Clarfication is was impossible to construct a defense without specific facts , specified concerns or statements made - to rebut. Exhibit 5, Notice of Charges

83.For example in the notice of charges Plaintiff was accused of over sedating the AF patient on page no. 1, that "the patient could not be cleared of sedation" , however, on page no. 4, Plaintiff was accused of insufficiently sedating that same AF patient such that he "had to be restrained."

84.I requested clarification of the charges and release of exculpatory information several times and all of those requests were Futile.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on, November 16, 2026, in Los Angels County, State of California

.

/s/ Charles R. Williams, M.D.
Plaintiff